PULTE HOME CORPORATION, Plaintiff v. AMERICAN SOUTHERN INSURANCE
COMPANY and TRANSAMERICA INVESTMENT, L.L.C., Defendants

No. COA06-747

(Filed 7 August 2007)

**1. Insurance— subcontractor's general liability policy—additional insured endorsement—coverage for general contractor's negligence**

An additional insured endorsement adding a general contractor to a subcontractor's commercial general liability policy "as an insured but only with respect to liability arising out of [the subcontractor's] operations" covered the general contractor for its independent negligence if a causal nexus exists between the general contractor's liability and the subcontractor's operations; it did not cover the general contractor only for vicarious liability based on the negligence of the subcontractor.

**2. Insurance— subcontractor's general liability policy—additional insured endorsement—coverage for general contractor's negligence**

A general contractor's alleged negligence in failing to provide safety devices or fall protection for a worker who fell while installing trusses in a house for a framing subcontractor arose out of the subcontractor's operations and was thus covered by an additional insured endorsement in the subcontractor's commercial general liability policy since the general contractor's alleged liability was a natural and reasonable incident or consequence of the subcontractor's operations. Therefore, the commercial general liability insurer had a duty to defend the general contractor in a suit to recover for the worker's injuries.

**3. Insurance— subcontractor's general liability policy—additional insured endorsement—suit against general contractor—delay in notice to insurer**

Defendant insurer was not justified in refusing to defend plaintiff general contractor under the additional insured endorsement in a subcontractor's commercial general liability policy on the ground that plaintiff failed to give defendant notice of the suit against it "as soon as practicable" as required by the policy where plaintiff showed that it acted in good faith during a six-month delay in notifying defendant insurer because the delay was a func-

PULTE HOME CORP. v. AMERICAN S. INS. CO.

[185 N.C. App. 162 (2007)]

tion of its internal polices for processing claims, and defendant conceded that it was not materially prejudiced by the delay.

**4. Insurance— insurer's unjustifiable refusal to defend—liability for reasonable settlement and defense costs**

An insurer who unjustifiably refused to provide a defense to an insured is liable for the settlement entered into by the insured and the costs of defense in the amount of $805,957 where the insured submitted evidence to the trial court regarding the reasonableness of the settlement and its defense costs, and the insurer presented no counter evidence and made no argument on appeal that the settlement or defense costs were unreasonable.

Appeal by plaintiff and defendant from order entered 8 December 2005 by Judge Narley L. Cashwell in Wake County Superior Court. Heard in the Court of Appeals 25 January 2007.

*Taylor, Penry, Rash & Riemann, PLLC, by Neil A. Riemann, for plaintiff-appellant.*

*Smyth & Cioffi, LLP, by Theodore B. Smyth, for TransAmerica Investment, L.L.C., defendant-appellant.*

*Mabry & McClelland, LLP, by Robert M. Darroch; and Brown, Crump, Vanore & Tierney, L.L.P., by O. Craig Tierney, Jr., for American Southern Insurance Company, defendant-appellee.*

GEER, Judge.

Plaintiff Pulte Home Corporation and defendant TransAmerica Investment, L.L.C. appeal from an order denying their motions for summary judgment against defendant American Southern Insurance Company and granting American Southern's motion for summary judgment. This appeal is resolved by the principle, well-established in North Carolina, that an insurer who unjustifiably refuses to provide an insured with a defense is liable for the amount and costs of a reasonable settlement entered into by the insured. *See Ames v. Cont'l Cas. Co.,* 79 N.C. App. 530, 538, 340 S.E.2d 479, 485, *disc. review denied,* 316 N.C. 730, 345 S.E.2d 385 (1986).

As this Court has previously pointed out, an insurer undertakes a substantial risk when it chooses not to provide a defense. *Pa. Nat'l Mut. Cas. Ins. Co. v. Associated Scaffolders & Equip. Co.,* 157 N.C. App. 555, 559, 579 S.E.2d 404, 407 (2003) ("We note that any insurer who denies a defense takes a significant risk that he is breaching his

duty to defend."). Although in *Pennsylvania National,* we concluded the risk was "well-taken," *id.* at 560, 579 S.E.2d at 408, the same cannot be said in this appeal. Because we have determined that the policy language covered the claims asserted against Pulte, American Southern unjustifiably refused to defend Pulte and is now liable for the settlement and Pulte's defense costs. Accordingly, we reverse and remand for entry of judgment in Pulte's and TransAmerica's favor.

### Facts and Procedural History

Pulte is a home-building company doing business in North Carolina. In the course of its business, Pulte, acting as a general contractor, hired TransAmerica, as a subcontractor, to frame houses in a residential subdivision in Wake County called Breckenridge. The contract between TransAmerica and Pulte required TransAmerica to have Pulte named as an additional insured under the subcontractor's commercial general liability coverage. To comply with this requirement, TransAmerica obtained an additional insured endorsement to its policy with American Southern. That endorsement provided that Pulte was covered "as an insured but only with respect to liability arising out of [TransAmerica's] operations or premises owned by or rented to [TransAmerica]."

In August 2002, Pulte, TransAmerica, and a third company, Morlando Enterprises, L.L.C., were sued by Marcos Antonio Mejia, who had worked at the Breckenridge site for a TransAmerica subcontractor named Rudolfo Sanchez. Mejia alleged that Sanchez "worked under the immediate direction, supervision, and control of [TransAmerica]" and, further, that Pulte "oversaw and directed the work of [TransAmerica] and other contractors at the work site, including the workers employed by Rudolfo Sanchez." Mejia's complaint alleged that, in October 2001, he was instructed to help install trusses on the houses.

Mejia claimed that, during the installation of the trusses, he was required to "work well above the floor level of the house [and] he was not provided any safety devices or means of fall protection." According to the complaint, a crane operator working for Morlando Enterprises was moving trusses from the ground to the roof when the crane knocked Mejia from the roof, causing him to fall to the ground and suffer severe, permanent injuries, including paraplegia.

In March 2003, approximately 7 months after the filing of the Mejia action, Pulte tendered the Mejia claims to American Southern,

## PULTE HOME CORP. v. AMERICAN S. INS. CO.

[185 N.C. App. 162 (2007)]

seeking legal defense and indemnity under the TransAmerica policy. In June 2003, American Southern rejected Pulte's tender and denied any obligation under the insurance policy to defend or indemnify Pulte in connection with the Mejia action. Pulte ultimately paid $700,000.00 to settle Mejia's claims and incurred approximately $105,000.00 in legal fees, expenses, and expert costs.

On 9 September 2004, Pulte filed this action against TransAmerica and American Southern, asserting that both parties had breached a contractual agreement to defend and indemnify Pulte in the Mejia case and were, therefore, liable for any losses incurred by Pulte in that litigation. Following discovery, all three parties moved for summary judgment. By its motion, TransAmerica sought a declaration that the American Southern policy provided coverage for Pulte's costs of defense and settlement in the Mejia action. Pulte moved for summary judgment against only American Southern, seeking (1) a declaration that American Southern was obligated to pay its defense and settlement costs and (2) an award of damages totaling $804,925.14 together with prejudgment interest. American Southern, in its motion, sought a declaration that the insurance policy did not cover the allegations against Pulte in the Mejia litigation and that it therefore had no duty to defend or indemnify Pulte.

A hearing on the motions was held, and on 8 December 2005, Judge Narley L. Cashwell of the Wake County Superior Court entered an order granting summary judgment to American Southern and denying Pulte's and TransAmerica's motions for summary judgment. Following a voluntary dismissal without prejudice of Pulte's claims against TransAmerica, both Pulte and TransAmerica gave timely notice of appeal.

### Discussion

It is well established in North Carolina that "[w]hen an insurer without justification refuses to defend its insured, the insurer is estopped from denying coverage and is obligated to pay the amount of any reasonable settlement made in good faith by the insured of the action brought against him by the injured party." *Ames*, 79 N.C. App. at 538, 340 S.E.2d at 485. *See also Penske Truck Leasing Co. v. Republic W. Ins. Co.*, 407 F. Supp. 2d 741, 753-54 (E.D.N.C. 2006) (noting that "North Carolina cases consistently hold" that insurer who unjustifiably refuses to defend insured is obligated to pay amount of reasonable settlement and insured's attorneys' fees); *Naddeo v. Allstate Ins. Co.*, 139 N.C. App. 311, 320, 533 S.E.2d 501, 507 (2000)

(holding that when carrier "unjustifiably refused to provide a defense," it obligated itself to pay the amount and costs of reasonable settlement); *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 735, 504 S.E.2d 574, 578 (1998) ("If a duty to defend could be found, then the trial court's granting of summary judgment for [the insured as to settlement and defense costs] is correct."); *Duke Univ. v. St. Paul Fire & Marine Ins. Co.*, 96 N.C. App. 635, 637, 386 S.E.2d 762, 763 ("By refusing to defend the wrongful death action [where such a defense was required by the policy], defendant obligated itself to pay the amount and costs of a reasonable settlement if its refusal was unjustified."), *disc. review denied*, 326 N.C. 595, 393 S.E.2d 876 (1990).

[1] The dispositive question in this case is whether American Southern unjustifiably refused to defend Pulte. It is undisputed that the American Southern policy contained a provision requiring the carrier to defend its insureds. Our Supreme Court has observed that "the insurer's duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 691, 340 S.E.2d 374, 377 (1986). This duty to defend "is ordinarily measured by the facts as alleged in the pleadings . . . ." *Id.* "When the pleadings state facts demonstrating that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable." *Id.* An insurer is excused from its duty to defend only "if the facts are not even arguably covered by the policy." *Id.* at 692, 340 S.E.2d at 378. *See also Builders Mut. Ins. Co. v. N. Main Constr., Ltd.*, 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006) (reaffirming principles set forth in *Waste Management*). Moreover, "[i]f the claim is within the coverage of the policy, the insurer's refusal to defend is unjustified even if it is based upon an honest but mistaken belief that the claim is not covered." *Bruce-Terminix*, 130 N.C. App. at 735, 504 S.E.2d at 578.

In support of its contention that it had no duty to defend, American Southern points to the policy endorsement naming Pulte as an additional insured. That provision specifies: "WHO IS AN INSURED (Section II) is amended to include as an insured [Pulte Home Corporation] but only with respect to liability arising out of [TransAmerica's] operations . . . ." American Southern construes this provision as meaning that it has insured Pulte only for vicarious liability based on the negligence of TransAmerica and not for any independent negligence of Pulte itself. American Southern then argues

that the Mejia complaint only sues Pulte for its independent negligence and, therefore, does not assert claims within the scope of the policy's coverage. We disagree.

The proper construction of the additional insured endorsement turns on the phrase "arising out of." In the insurance context, this phrase frequently appears in policy provisions both extending and excluding coverage. When construing policies, North Carolina applies the rule that "[w]hile policy provisions excluding coverage are strictly construed in favor of the insured, those provisions which extend coverage 'must be construed liberally so as to provide coverage, whenever possible by reasonable construction.'" *City of Greenville v. Haywood*, 130 N.C. App. 271, 276, 502 S.E.2d 430, 433 (quoting *State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 318 N.C. 534, 538, 350 S.E.2d 66, 68 (1986)), *disc. review denied*, 349 N.C. 354, 525 S.E.2d 449 (1998). Further, when, as here, the policy does not define the phrase "arising out of," we must read the phrase in accordance with "the ordinary meaning of [that phrase]." *Id.*, 502 S.E.2d at 433-34.

If used to extend, rather than exclude, coverage, our courts have broadly construed the phrase "arising out of" to require a simple "causal nexus," *id.* at 277, 502 S.E.2d at 434, and not causation rising to the level of proximate cause, *State Capital*, 318 N.C. at 539-40, 350 S.E.2d at 69. As explained by the Supreme Court in reference to the words "arising out of the use of an automobile":

"The words 'arising out of' are not words of narrow and specific limitation but are broad, general, and comprehensive terms affecting broad coverage. They are intended to, and do, afford protection to the insured against liability imposed upon him for all damages caused by acts done in connection with or arising out of such use. They are words of much broader significance than 'caused by.' They are ordinarily understood to mean . . . 'incident to,' or 'having connection with' the use of the automobile."

*Id.* at 539, 350 S.E.2d at 69 (ellipsis original) (quoting *Fid. & Cas. Co. of N.Y. v. N.C. Farm Bureau Mut. Ins. Co.*, 16 N.C. App. 194, 198, 192 S.E.2d 113, 118, *cert. denied*, 282 N.C. 425, 192 S.E.2d 840 (1972)). The Supreme Court then held that, when applying the phrase "arising out of" the use of an automobile, "the test is whether there is a causal connection between the use of the automobile and the accident," such that the "injuries were a natural and reasonable incident or consequence of the use of the motor vehicle." *Id.* at 540, 350 S.E.2d at 69-70.

**PULTE HOME CORP. v. AMERICAN S. INS. CO.**

[185 N.C. App. 162 (2007)]

In *Haywood*, 130 N.C. App. at 276, 502 S.E.2d at 433, this Court applied the *State Capital* test in construing an insurance policy's coverage for injuries that "arise out of the performance of the INSURED'S law enforcement duties." After noting that *State Capital* called for "a liberal construction" of the phrase "arising out of," *id.*, 502 S.E.2d at 434, the Court held that because the conduct at issue would not have occurred "but for" the insured's position as a police officer, there was the required "causal nexus" to establish that the insured's conduct arose out of his law enforcement duties. *Id.* at 277, 502 S.E.2d at 434.

In this case, we are—like the Supreme Court in *State Capital* and this Court in *Haywood*—construing a provision extending coverage. Accordingly, American Southern's duty to defend rests on whether there is a causal nexus between Pulte's liability in the Mejia matter and TransAmerica's "operations." A sufficient nexus exists if that liability is "a natural and reasonable incident or consequence of" those operations. *State Capital*, 318 N.C. at 540, 350 S.E.2d at 70.

American Southern does not address *State Capital*, but rather argues that the phrase "arises out of TransAmerica's operations" equates with "arises out of Transamerica's [sic] negligence." American Southern states in its brief: "Because the additional insured endorsement limits coverage to liability arising out of TransAmerica's operations, i.e. arises out of Transamerica's [sic] negligence, Pulte is not an additional insured or entitled to a defense for the specific allegations made by Mejia." The simple answer to this argument is that the policy reads "operations" and not "negligence." It does not define "operations," and we can perceive no reasonable basis for equating the two words. To the extent that this clause can even be viewed as ambiguous, American Southern's argument disregards the principle that the policy must be construed in favor of the insured, Pulte. *Id.* at 541, 350 S.E.2d at 70.

Moreover, if we were to construe the endorsement in the manner American Southern urges—to extend coverage to Pulte only to the extent that Pulte's liability might arise out of TransAmerica's negligence—coverage would be almost non-existent. As American Southern has acknowledged, in North Carolina, an employer of an independent contractor generally cannot be held vicariously liable for the negligent acts of that independent contractor. *See Gordon v. Garner*, 127 N.C. App. 649, 658, 493 S.E.2d 58, 63 (1997) ("Generally, one who employs an independent contractor is not liable for the independent contractor's negligence."), *disc. review denied*, 347 N.C.

670, 500 S.E.2d 86 (1998). Thus, limiting American Southern's coverage of Pulte to vicarious liability would provide no genuine insurance for Pulte. American Southern suggests that the endorsement would still provide insurance for "false allegations" of vicarious liability and liability arising from the actions of "loaned servants." Such a cramped reading of coverage cannot be reconciled with our State's policy of construing ambiguous insurance policies in favor of the insured and in a manner that provides coverage.

In support of its narrow reading of the endorsement, American Southern relies upon a single federal case construing North Carolina law: *St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co.*, 187 F. Supp. 2d 584 (E.D.N.C. 2000). At issue in that case was an additional insured endorsement to a commercial general liability policy that provided as follows:

> WHO IS AN INSURED (Section II) is amended to include any person or organization you are required by written contract to include as an insured, but only with respect to liability arising out of "your work." *This coverage does not include liability arising out of the independent acts or omissions of such person or organization.*

*Id.* at 587 (emphasis added).

Unlike the endorsement in this case, the endorsement in *St. Paul* contains express language excluding coverage for the "independent acts or omissions" of the additional insured.[1] The district court noted first that the insurer "contends that, because the policy specifically excludes coverage for liability arising from independent acts or omissions of the additional insured, the language of the 'Who is an Insured' paragraph effectively limits coverage to coverage for vicarious liability, i.e., liability imposed upon the general contractor as a result of the subcontractor's acts and not as a result of the general contractor's own acts or failure to act." *Id.* at 589-90. The district court agreed, holding that "to give meaning to the 'independent acts' provision of the endorsement, the court must construe the 'arising out of [the subcontractor's work]' provision as one providing coverage in cases where the alleged liability is vicarious." *Id.* at 590.

Given the absence of similar qualifying language in this case, *St. Paul*, although not controlling on this Court in any event, is not con-

---

1. In its brief, American Southern, when quoting the policy at issue in *St. Paul*, conveniently omits this portion of the provision, substituting an ellipsis.

trary to our conclusion that the additional insured endorsement here must be broadly interpreted to provide coverage for liability arising from Pulte's independent negligence if there is a causal nexus with TransAmerica's operations. Indeed, *St. Paul* demonstrates that insurers are well able to write policies to accomplish the result urged by American Southern when they desire to do so. American Southern's position that this endorsement must be construed to include a limitation that is conspicuously absent from the policy is untenable.

Moreover, we find persuasive those decisions from other jurisdictions where similar endorsement language contained within a commercial general liability policy has been interpreted to provide coverage to the additional insured even for liability arising from the additional insured's own independent negligence. *See Acceptance Ins. Co. v. Syufy Enters.*, 69 Cal. App. 4th 321, 330, 81 Cal. Rptr. 2d 557, 563 (Cal. Ct. App.) ("We believe the better view is that when an insurer chooses not to use such clearly limited language [covering only vicarious liability] in an additional insured clause, but instead grants coverage for liability 'arising out of' the named insured's work, the additional insured is covered without regard to whether injury was caused by the named insured or the additional insured."), *review denied*, 1999 Cal. LEXIS 2212 (Cal. 1999); *Cas. Ins. Co. v. Northbrook Prop. & Cas. Ins. Co.*, 150 Ill. App. 3d 472, 474-76, 501 N.E.2d 812, 814-15 (Ill. App. Ct. 1986) (where general contractor was listed as additional insured on subcontractor's policy "but only with respect to liability arising out of operations performed for [general contractor] by [subcontractor]," insurer had duty to defend general contractor irrespective whether subcontractor was negligent); *Admiral Ins. Co. v. Trident NGL, Inc.*, 988 S.W.2d 451, 454 (Tex. App. 1999) ("The majority view of these cases is that for liability to 'arise out of operations' of a named insured it is not necessary for the named insured's acts to have 'caused' the accident.").

In response to Pulte's citation of cases in other jurisdictions, American Southern, both before the trial court and this Court, made the broad assertion that, in reality, our sister jurisdictions are substantially divided as to the proper interpretation of endorsements of the type at issue here. Notably, however, American Southern did not cite to any authority, either in its principal brief or in a memorandum of additional authority pursuant to N.C.R. App. P. 28(g), save for the one lone example, *St. Paul*, that we find distinguishable.

[2] Consequently, we agree with Pulte and TransAmerica that the additional insured endorsement, by its plain terms, triggered

American Southern's duty to defend Pulte against the Mejia claims, when those claims bore a causal nexus with TransAmerica's "operations" at the job site. The parties do not dispute that TransAmerica's "operations" included TransAmerica's framing activities at Pulte's job site.

In determining whether an insurer has a duty to defend the underlying lawsuit, "our courts employ the so-called 'comparison test.' " *Holz-Her U.S., Inc. v. U.S. Fid. & Guar. Co.*, 141 N.C. App. 127, 128, 539 S.E.2d 348, 349 (2000) (quoting *Smith v. Nationwide Mut. Fire Ins. Co.*, 116 N.C. App. 134, 135, 446 S.E.2d 877, 878 (1994)). That test requires us to read the pleadings in the underlying suit side-by-side with the insurance policy to determine whether the alleged injuries are covered or excluded. *Id.*

An insurer is excused from its duty to defend only "if the facts [alleged in the complaint] are not even arguably covered by the policy." *Waste Mgmt.*, 315 N.C. at 692, 340 S.E.2d at 378. Any doubt as to coverage must be resolved in favor of the insured. *Bruce-Terminix*, 130 N.C. App. at 735, 504 S.E.2d at 578. If the "pleadings allege multiple claims, some of which may be covered by the insurer and some of which may not, *the mere possibility* the insured is liable, and that the potential liability is covered, may suffice to impose a duty to defend." *Id.* (emphasis added).

In this case, the Mejia complaint alleges that Mejia's injuries occurred while he was working for a TransAmerica subcontractor helping with the installation of trusses on a house, part of TransAmerica's framing activities. Mejia was performing the work that TransAmerica wanted done, and "Pulte's principals, agents, and employees oversaw and directed the work of Defendant TransAmerica and other contractors at the work site, including the workers employed by Rudolfo Sanchez," which would include Mejia. In his specific claims against Pulte, Mejia further alleged that Pulte was negligent in failing to ensure that the work performed by its subcontractors—including TransAmerica—was carried out in a reasonably safe manner and failed to ensure that those subcontractors took necessary precautions to reduce risks accompanying the work performed at the construction site.

On its face, the allegations of the Mejia complaint indicate that Pulte's liability was "a natural and reasonable incident or consequence of" TransAmerica's operations. *State Capital*, 318 N.C. at 540, 350 S.E.2d at 70. These allegations set forth a sufficient con-

nection between the work that Mejia was performing—part of TransAmerica's framing operations—and the liability that Mejia sought to impose on Pulte to require us to conclude that at least "arguably" the conduct alleged in the complaint is covered by the additional insured endorsement.

[3] We therefore hold that American Southern had a duty to defend Pulte in the Mejia litigation. American Southern further contends, however, that its refusal to defend Pulte in the Mejia matter was nevertheless justified, and summary judgment was proper, because Pulte failed to comply with the policy's notice requirements. The policy requires any insured to notify American Southern "as soon as practicable" after a claim is made or suit is brought against the insured.

Our Supreme Court has articulated the following three-part test to determine whether, under a policy requiring notice "as soon as practicable," untimely notice by the insured will excuse the insurer from an otherwise existing duty to defend and indemnify:

> When faced with a claim that notice was not timely given, the trier of fact must first decide whether the notice was given as soon as practicable. If not, the trier of fact must decide whether the insured has shown that he acted in good faith, *e.g.*, that he had no actual knowledge that a claim might be filed against him. If the good faith test is met the burden then shifts to the insurer to show that its ability to investigate and defend was materially prejudiced by the delay.

*Great Am. Ins. Co. v. C. G. Tate Constr. Co.*, 303 N.C. 387, 399, 279 S.E.2d 769, 776 (1981) (*Great American I*). The Supreme Court reaffirmed and further explained the three-pronged approach in *Great Am. Ins. Co. v. C. G. Tate Constr. Co.*, 315 N.C. 714, 340 S.E.2d 743 (1986) (*Great American II*).

With respect to the first prong—"whether there has been any delay in notifying the insurer"—the Court held in *Great American II* that "[i]n most instances, unless the insurer's allegations that notice was not timely are patently groundless, this first part of the test is met by the fact that the insurer has introduced the issue to the court." *Id.* at 719, 340 S.E.2d at 747. In light of the six-month delay between Pulte's receipt of the Mejia complaint and Pulte's tender to American Southern, we hold that the first prong of the *Great American I* test has been met. Since American Southern conceded at oral argument that it was never materially prejudiced by the delay (the third prong),

**PULTE HOME CORP. v. AMERICAN S. INS. CO.**

[185 N.C. App. 162 (2007)]

our focus here is confined to the second prong of the test: whether Pulte acted in good faith.

We note that American Southern, in its 10 June 2003 letter declining to provide a defense to Pulte, asserted only that "[t]hese six months clearly materially impaired American Southern's ability to investigate the claim"—an argument now abandoned on appeal. The letter contained no suggestion that Pulte lacked good faith in delaying its tender of the claim. When asked in interrogatories to identify any facts on which American Southern relied to establish the defense of untimely notification, American Southern stated only: "The facts are laid out clearly in the June 10, 2003 correspondence to Plaintiff's counsel from counsel for this Defendant which is enclosed." American Southern raised the issue of good faith for the first time shortly before the summary judgment hearing.

As indicated in *Great American I*, the burden is initially on the insured to demonstrate that it acted in good faith. In this case, Pulte furnished the trial court with an affidavit of its corporate counsel, Michael Laramie. The Laramie affidavit stated that at the time Pulte was served with the Mejia lawsuit, Pulte had the policy of investigating to determine whether Pulte could tender to a subcontractor or an insurer. The affidavit explained further: "That investigation is not simple, however, as records regarding our vendors and their insurance are kept in our local market offices. Under ordinary circumstances, it would involve inquiring of the local market to retrieve those vendor records and ascertain which vendors, and which vendor insurers, might be responsible."

Pulte made inquiry of the local market in Raleigh, obtained the necessary information regarding TransAmerica's insurer, and tendered the claim to American Southern. The affidavit concludes:

At no time did [Pulte] purposely, knowingly, or deliberately delay or fail to notify a potentially responsible vendor or insurer of the suit. At no time did [Pulte] instruct its counsel to do those things. At no time did [Pulte] act in bad faith. No conceivable benefit would accrue from such actions, and they would have been contrary to [Pulte's] policy. Any delays on [Pulte's] part were either inadvertent or the result of difficulty obtaining information.

American Southern submitted no affidavits, depositions, or other evidence in response to this affidavit and Pulte's showing of good faith.

On appeal, American Southern argues solely that it was entitled to summary judgment on this ground because: "Pulte knew that a claim had been filed against it for which it may be at fault and failed to notify American Southern. Therefore, as the test laid out by *Great American* requires, 'if the insured knows that he is liable or . . . that others claim he is at fault, an untimely delay in notification . . . is a delay without good faith.' " (Quoting *Great American II*, 315 N.C. at 720, 340 S.E.2d at 747.)

American Southern has, however, misread *Great American II*. In that decision, the Supreme Court specifically held:

This test of lack of good faith involves a two-part inquiry:

1)  Was the insured aware of his possible fault, and

2)  Did the insured *purposefully and knowingly* fail to notify the insurer.

Both of these are, in the legal sense of the term, "subjective" inquiries . . . .

*The good faith test is phrased in the conjunctive: both knowledge and the deliberate decision not to notify must be met for lack of good faith to be shown. If the insured can show that either does not apply, then the trial court must find that the insured acted in good faith.*

*Id.* (emphases added). Contrary to American Southern's contention, the test thus is not simply whether Pulte knew of its potential liability.

In analyzing the evidence (all presented by Pulte) American Southern first asserts that a delay of six months was not reasonable— an assertion that only goes to the first prong of *Great American I*. American Southern then does not point to anything that suggests that Pulte made a "deliberate decision not to notify" American Southern, the proper test for the good faith prong. *Id.* Instead, American Southern asserts simply that "[a]ll of this [evidence] reveals actual knowledge on the part of Pulte that shows a lack of good faith in its delayed notification to American Southern."

Because Pulte has presented evidence that it did not make a deliberate decision not to notify American Southern, but rather any delay was a function of its internal policies for processing claims, American Southern was not entitled to summary judgment on this

argument. Moreover, because American Southern has pointed to no evidence contrary to that of Pulte, suggesting a purposeful, intentional, or deliberate decision by Pulte to delay notification, Pulte is entitled to summary judgment on the question whether Pulte's delayed notification justified American Southern's refusal to defend. *See Duke Univ. v. St. Paul Mercury Ins. Co.*, 95 N.C. App. 663, 678, 384 S.E.2d 36, 45 (1989) (holding that delay of three and a half months was in good faith when delay was due to insured's system of reporting because while such a system "may be unwise or negligent, reliance on that system does not constitute a deliberate failure to notify the insurer under *Great American II*").

[4] Finally, although Pulte, in support of its motion for summary judgment, submitted evidence to the trial court regarding the reasonableness of the settlement and its defense costs, American Southern presented no counter evidence and makes no argument on appeal that the settlement or defense costs were unreasonable. Accordingly, the trial court should have entered summary judgment in Pulte's favor in the amount of $805,957.74 together with prejudgment interest, as requested by Pulte.[2]

Pulte has also addressed, on appeal, arguments made by American Southern before the trial court regarding other insurance covering Pulte's activities during the relevant time frame. In response, American Southern argues only that because it had no duty to defend, one of the other carriers, Legion Insurance Company, was the primary carrier. Since we have concluded that American Southern did in fact have a duty to defend, American Southern has presented no argument on appeal supporting any contention that it should not be held liable for the amount of $805,957.74 based on the existence of other coverage. We express no opinion whether American Southern would be entitled to seek relief from the other carriers.

## Conclusion

For the foregoing reasons, we hold that Pulte and TransAmerica were entitled to declarations that American Southern owed a duty to defend Pulte and that American Southern was unjustified in refusing to provide that defense. Since American Southern does not contend that Pulte's settlement or its defense costs in the Mejia litigation were unreasonable, Pulte is entitled to judgment in the amount of $805,957.74 plus prejudgment interest. We, therefore, reverse the trial

---

2. This sum is greater than the amount sought in Pulte's motion for summary judgment, but is supported by an affidavit filed prior to the summary judgment hearing.

court's order granting summary judgment to American Southern and remand for entry of judgment in favor of Pulte and TransAmerica.

Reversed and remanded.

Judges CALABRIA and JACKSON concur.