**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: ABRAMS & ABRAMS, P.A.;
ST. MARTIN, WILLIAMS AND
BOURQUE,

*Appellants.*

JERRY PELLEGRIN, Guardian Ad
Litem for Mark Pellegrin,

*Plaintiff,*

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH,
PENNSYLVANIA,

*Defendant.*

No. 09-1283

LOUISIANA ASSOCIATION FOR JUSTICE;
AMERICAN ASSOCIATION FOR JUSTICE;
PUBLIC JUSTICE,

*Amici Supporting Appellants,*

THOMAS SHIPLEY JONES,

*Court-Assigned Amicus Counsel.*

In Re: Abrams & Abrams, P.A.;
St. Martin, Williams and Bourque

---

Jerry Pellegrin, Guardian Ad
Litem for Mark Pellegrin,

*Plaintiff-Appellant,*

v.

National Union Fire Insurance
Company of Pittsburgh,
Pennsylvania,

*Defendant.*

---

Louisiana Association for Justice;
American Association for Justice;
Public Justice,

*Amici Supporting Appellant,*

Thomas Shipley Jones,

*Court-Assigned Amicus Counsel.*

No. 09-1285

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:08-cv-00349-BO)

Argued: March 23, 2010

Decided: May 18, 2010

Before TRAXLER, Chief Judge, WILKINSON,
Circuit Judge, and HAMILTON, Senior Circuit Judge.

Vacated and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Traxler and Senior Judge Hamilton joined.

---

**COUNSEL**

**ARGUED**: James P. Cooney, III, WOMBLE, CARLYLE, SANDRIDGE & RICE, PLLC, Charlotte, North Carolina, for Appellants; John Keating Wiles, CHESHIRE, PARKER, SCHNEIDER, BRYAN & VITALE, Raleigh, North Carolina, for Jerry Pellegrin, Guardian Ad Litem for Mark Pellegrin. Thomas Shipley Jones, JONES DAY, Pittsburgh, Pennsylvania, for Court-Assigned Amicus Counsel. **ON BRIEF:** Joseph B. Cheshire, CHESHIRE, PARKER, SCHNEIDER, BRYAN & VITALE, Raleigh, North Carolina, for Jerry Pellegrin, Guardian Ad Litem for Mark Pellegrin. Bruce C. Dean, Chairman, Amicus Curiae Committee, BRUCE C. DEAN, LLC, Metairie, Louisiana, for Louisiana Association for Justice, Amicus Supporting Appellants. Les Weisbrod, President, AMERICAN ASSOCIATION FOR JUSTICE, Washington, D.C., Arthur A. Bryant, Executive Director, PUBLIC JUSTICE, Washington, D.C., Jeffrey R. White, CENTER FOR CONSTITUTIONAL LITIGATION, P.C., Washington, D.C., for American Association for Justice and Public Justice, Amici Supporting Appellants. Charles H. Moellenberg, Stephanie D. Taylor, JONES DAY, Pittsburgh, Pennsylvania, for Court-Assigned Amicus Counsel.

---

**OPINION**

WILKINSON, Circuit Judge:

After winning their disabled client an $18 million personal injury settlement that will pay for his care for the rest of his life, the attorneys in this case saw their compensation slashed

by the district court from the thirty-three percent provided in their contingency fee agreement to a mere three percent. While a district court does possess discretion in approving fee awards, particularly when its power to protect minors or the disabled is involved, we hold that the court here abused that discretion by improperly applying the standards we have established for determining whether an attorney's fee is reasonable. As a result, we vacate and remand.

I.

On New Year's Eve 2005 in Raleigh, North Carolina, twenty-six year old Mark Pellegrin was struck by a truck driven by his friend, Kelly McKiernan, who had been drinking. Pellegrin hit his head on the pavement, and paramedics found him unconscious and unable to breathe as a result of his injuries. The bleeding, swelling, and lack of oxygen that resulted caused permanent, severe brain damage. Pellegrin spent 112 days in the hospital and can no longer walk, talk, or even roll over. He is completely dependent on others for feeding, dressing, washing, and toileting. He is, however, partially conscious and can communicate through facial reactions. If Pellegrin lives to full life expectancy, his future care and medical expenses are estimated to cost approximately $17 million.

At the time of his injury, Mark Pellegrin worked for KCI Technologies as a crew leader for communications tower inspections, and McKiernan was one of his crew members. Because the tower inspections frequently required travel, KCI provided company trucks to many of its employees, including McKiernan. KCI had a written policy prohibiting employees from operating its equipment while intoxicated.

On December 31, 2005, Pellegrin asked McKiernan to come to his house to check equipment for an upcoming inspection. McKiernan drove his KCI truck to Pellegrin's home. After working for a while, Pellegrin and McKiernan

began drinking to celebrate New Year's Eve. Eventually McKiernan decided to leave but was prevented by Pellegrin, who told him he could not drive. When Pellegrin left the room, however, McKiernan said that he:

> took the keys and . . . ran. I was just trying to get out of there. And that's when I walked down to the truck. Basically, I put it in reverse, went to a stop and put it in drive. Of course I've got to mess with the radio. . . . Why couldn't I see him? And I—I—I hit him. I'm sure he was just coming down to tell me, you know, man, what are you doing. Kelly, you're drunk, dude.

McKiernan called 911, and when police arrived he told them to "just put me in handcuffs. You know, I'm drunk. I accidentally hit my buddy who was just trying to stop me from leaving." Police officers found human hair on the truck's front grill. McKiernan later pled guilty to driving while intoxicated and has never denied that he was responsible for the accident.

Pellegrin's father, Jerry, was appointed as his son's General Guardian in North Carolina some two months after the accident and remains Pellegrin's primary caregiver. Because the Pellegrins are from Louisiana, Jerry Pellegrin retained attorney Charles Bourque of the Louisiana law firm St. Martin, Williams and Bourque to attempt to recover for his son's injuries. The retainer agreement Jerry Pellegrin signed agreed to pay Bourque's firm thirty-three percent of any gross recovery, plus litigation expenses.[1] With Jerry Pellegrin's consent, Bourque then retained the North Carolina firm of Abrams & Abrams, P.A., agreeing to split any contingency fee equally.

Before Jerry Pellegrin even signed the agreement, KCI's insurer, National Union Fire Insurance Company of Pitts-

---

[1]The contract technically provided for a thirty-three and one-third percent fee, but for convenience we will round to the nearest full percent.

burgh, Pennsylvania, transmitted a "reservation of rights" letter to McKiernan, denying coverage for the accident. Although KCI carried $21 million in insurance, National Union claimed it was not obligated to pay because McKiernan violated KCI's internal rules by driving while intoxicated.

The insurance policy, however, did not incorporate KCI's internal rules, and Pellegrin's counsel believed that North Carolina courts had already rejected a similar defense in *United Services Automobile Association v. Rhodes*, 577 S.E.2d 171 (N.C. App. 2003). In that case, an insurance company was required to cover expenses arising from an accident involving a rental car driven by an intoxicated driver, even though the rental agreement prohibited drunk driving. *Id.* at 173. Pellegrin's counsel thus filed suit in North Carolina court against Kelly McKiernan on July 19, 2007, after some six months of investigation.

National Union not only again disclaimed any coverage but also refused even to defend McKiernan. Under North Carolina law, if an insurer improperly refuses to defend a claim, it is estopped from denying coverage and must pay any reasonable settlement—even if it made an honest mistake in its denial. *See Pulte Home Corp. v. Am. S. Ins. Co.*, 647 S.E.2d 614, 617 (N.C. App. 2007); *Bruce-Terminix Co. v. Zurich Ins. Co.*, 504 S.E.2d 574, 578 (N.C. App. 1998). Because Pellegrin's counsel drafted their complaint against McKiernan to state only that McKiernan negligently struck Mark Pellegrin with a KCI vehicle he was operating with the company's "knowledge, consent and permission," the complaint triggered National Union's duty to defend the suit, which is based on facts alleged in pleadings and is broader than the duty to indemnify. *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 377 (N.C. 1986).

Without National Union, McKiernan could not afford counsel and instead defended himself. Several depositions were taken and a trial date set, but McKiernan did not appear at

trial. As a result, the district court entered a $75 million judgment against him. McKiernan obviously lacked the funds to satisfy such a judgment, and counsel filed a second complaint against National Union within the thirty day time limit provided in North Carolina law to alter or amend a judgment. That complaint contained a description of the McKiernan suit and attached a copy of the judgment. It sought a declaration that National Union was liable for the full $75 million judgment against McKiernan because of its insurance coverage and its failure to defend the earlier suit, and it designated Pellegrin as a third-party beneficiary.

At this point, National Union removed the suit to federal court, invoking federal diversity jurisdiction. A one-day mediation took place on August 28, 2008, at the end of which National Union agreed to pay $18 million to resolve all claims. Of that amount, $6 million went into a Special Needs Trust designed to supplement Pellegrin's care. The next $6 million purchased a structured annuity that was guaranteed to make monthly payments for Pellegrin's support for at least thirty years and would continue to pay after that point for the duration of his life. Over the first thirty years, the annuity was guaranteed to pay $12.1 million, and if Pellegrin lived to 78, his life expectancy if he were healthy, it would pay $29.9 million. The final $6 million was to be paid outright and used to satisfy the retainer agreement. There is no dispute that the settlement agreement will provide amply for Pellegrin throughout his life.

Because Pellegrin was incompetent, National Union and Jerry Pellegrin jointly moved for court approval of the settlement. The district court questioned Pellegrin's attorneys about their work, demanding to know how many hours they had spent on the case. At first, Douglas Abrams of Abrams & Abrams, P.A. replied that the firm did not keep hourly records because it only took contingency cases. When pressed, he guessed that "our firm alone has a thousand hours" and that Bourque's firm "has at least a thousand hours." Bourque esti-

mated his firm's time as "something well in excess of a thousand hours." No other evidence about hours was presented.

At the close of the hearing, Pellegrin's father and guardian addressed the court. He said:

> I'd like to state that I'm not a big fan of lawyers myself. However, these people Abrams, Chuck Bourque, have shown me and my son more compassion and help and I do not begrudge them anything. I think they earned everything. I was proud of them and we're all tired and ready for this to be over.

In spite of this request, the district court reduced the lawyers' compensation from $6 million to $600,000, or from thirty-three percent down to three percent of the settlement. *Pellegrin v. Nat'l Union Fire Ins. Co.*, 598 F. Supp. 2d 724, 730-31 (E.D.N.C. 2009). The $5.4 million balance reverted to Pellegrin. The court reached this number by taking what it termed counsel's "pure speculation" as to the number of hours worked and multiplying it by a $300 per hour rate that it believed was "a high hourly rate for a similarly-situated lawyer in North Carolina." *Id.* at 730. This appeal by Pellegrin's counsel followed. We appointed amicus counsel to defend the district court's fee decision as National Union had no stake in the outcome on appeal.[2]

## II.

In this case, "[w]e review a district court's award of attorney's fees for abuse of discretion." *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). As an initial matter, the district court in this case properly noted that courts evaluate attorney's fees under a reasonableness standard. Pellegrin's lawyers contend that they are entitled to have their

---

[2]The court wishes to extend its thanks to amicus counsel for its able assistance in this matter.

contingency fee agreement enforced unless the resultant fees are "clearly excessive." As they see it, only agreements that are so excessive that no ethical attorney could sign them should be cast aside. That standard presents its problems, however, because it allows approval of fees that are unreasonable and excessive just so long as they are not clearly so.

The simpler standard of "reasonableness" is one that Congress and many courts have adopted. For instance, in the fee-shifting context under 42 U.S.C. § 1988(b), which applies to certain civil rights suits, a "court, in its discretion, may allow the prevailing party, other than the United States, a *reasonable* attorney's fee." 42 U.S.C. § 1988(b) (emphasis added). *See also Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978) (evaluating fee-shifting attorney fee for reasonableness). Nor is the reasonableness standard limited to the fee-shifting context. As we noted in *Bergstrom v. Dalkon Shield Claimants' Trust (In re A.H. Robins Co.)*, "the law of this circuit has long been clear that federal district courts have inherent power and an obligation to limit attorneys' fees to a reasonable amount." 86 F.3d 364, 373 (4th Cir. 1996). In particular, "[t]he district courts' supervisory jurisdiction over contingent fee contracts for services rendered in cases before them is well-established." *Allen v. U.S.*, 606 F.2d 432, 435 (4th Cir. 1979). Here too the review of fee arrangements is for reasonableness.

Indeed, it is difficult to imagine why any different standard would be warranted. In a case like this involving a minor or disabled individual, a district court plainly enjoys discretion to protect those who come in front of it. In general, "infant[s] and other incompetent parties are wards of any court called upon to measure and weigh their interests." *Dacanay v. Mendoza*, 573 F.2d 1075, 1079 (9th Cir. 1978). As a result, "[i]t has long been established that the court in which a minor's claims are being litigated has a duty to protect the minor's interests." *Salmeron v. U.S.*, 724 F.2d 1357, 1363 (9th Cir. 1983). This duty is intended to protect those who may be

especially vulnerable to manipulation or who may be unable to protect themselves. *Id.*

Integral to this protective judicial role is ascertaining whether attorney fee agreements involving minors or incompetents are reasonable. "Independent investigation by the court as to the fairness and reasonableness of a fee to be charged against a minor's estate or interest is required." *Dean v. Holiday Inns, Inc.*, 860 F.2d 670, 673 (6th Cir. 1988); *Cappel v. Adams*, 434 F.2d 1278, 1280 (5th Cir. 1970) (same; noting "the obvious possibilities of unfair advantage"). Moreover, the public reputation of the profession would deservedly suffer if attorneys were seen to be gouging those least able to fend for themselves. Consistent with this charge, the local rules of the Eastern District of North Carolina state that in approving a settlement, "the court shall approve or fix the amount of the fee to be paid to counsel for the minor or incompetent parties." E.D.N.C.L.R. 17.1(c).

The parties spend a great deal of time and energy debating whether the review of attorney's fees is a federal or state question, whether North Carolina or Louisiana law applies, and what exactly the laws of each jurisdiction may or may not be. We are not convinced, however, that the law of either state is so different from the federal standard as to make a difference, *see Mitzel v. Westinghouse Elec. Corp.*, 72 F.3d 414, 416-18 (3d Cir. 1995) (ruling that attorney fee determination in contingency case is federal procedural question but holding that analysis would be the same even under state substantive law). And we are persuaded that the virtues of simplicity and straightforwardness counsel against adopting different standards with different shades and nuances in different contexts. The district court therefore did have the discretion to review the settlement here, including the contingency fee, for reasonableness.

### III.

The district court's discretion is by no means unguided, however. District courts should look at the twelve factors first

set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), and adopted by this court in *Barber*, 577 F.2d at 226, and *Allen*, 606 F.2d at 436 n.1. In *Allen*, we stated the factors as follows:

> (1) the time and labor required in the case, (2) the novelty and difficulty of the questions presented, (3) the skill required to perform the necessary legal services, (4) the preclusion of other employment by the lawyer due to acceptance of the case, (5) the customary fee for similar work, (6) the contingency of a fee, (7) the time pressures imposed in the case, (8) the award involved and the results obtained, (9) the experience, reputation, and ability of the lawyer, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship between the lawyer and the client, and (12) the fee awards made in similar cases.

*Id.*[3] Though *Barber* upheld an award in a Truth in Lending Act fee-shifting case under 15 U.S.C. § 1640(a)(3), *Allen* was a contingency fee case and noted that "[t]hese factors . . . apply even where the fee request is based on a private fee agreement." *Allen*, 606 F.2d at 435-36.

Although the district court correctly recognized that some factors may not have much, if anything, to add in a given case, *Pellegrin*, 598 F. Supp. 2d at 728 (citing *Bergstrom*, 86 F.3d at 376), the factors that do apply should be considered. "We cannot afford effective appellate review unless we have

---

[3] The district court relied upon *Barber's* formulation of factor six, which addresses "the attorney's expectations at the outset of the litigation." 577 F.2d at 226 n.28. *Allen* rephrased this factor to address "the contingency of a fee." 606 F.2d at 436 n.1. While both formulations address the basic question of how an attorney anticipates being paid, we have recognized that *Allen's* version is superior for cases like the present one "because it deals with contingent fees and places upon the district court the obligation to limit such fees to a reasonable amount." *Bergstrom*, 86 F.3d at 376.

before us the district court's reasons for finding a particular award appropriate." *Barber*, 577 F.2d at 226. Particularly when such a steep and indeed drastic reduction from the fee provided in the retainer agreement was ordered, some care in explanation might be expected. The district court here neglected to consider several critically important factors in its analysis. For example, it failed to adequately address the contingency of the fee (factor 6), the award involved and the results obtained (factor 8), and the fee awards made in similar cases (factor 12). We consider these factors in turn.

## A.

The chief error in the district court's analysis was its failure to recognize the significance of the contingency fee in this case. The court obviously knew that a contingency fee was involved, but it did not give that fact the weight it was due in the decisional calculus. After quoting language from *Allen* stating that contingency agreements are subject to supervision by courts for reasonableness, 606 F.2d at 435, the court merely stated that it "must consider the other relevant *Barber* factors in order to determine the reasonableness of the contingency fee requested by Plaintiff's Counsel." *Pellegrin*, 598 F. Supp. 2d at 728. It then proceeded to apply an hourly rate calculation based on dubious estimations of the applicable hours and rates with no further consideration of the relevance of the contingency fee agreement. *Id.* at 728-30. Fixing a lodestar fee in this contingency case was error and threatens to nullify the considerable advantages of contingency arrangements.

### 1.

As an initial matter, contingency fees provide access to counsel for individuals who would otherwise have difficulty obtaining representation. Sadly, a plaintiff sometimes has little to offer a lawyer other than his personal plight. As an advocate before the Kentucky Supreme Court noted as early as 1823, in the absence of contingency fees a client "may not

have any thing else to give, and without the aid of the matter in the contest, he can never sue for his right, not having otherwise the means to employ counsel." *Rust v. Larue*, 14 Ky. (4 Litt.) 411, 421 (1823) (quoted in Peter Karsten, Enabling the Poor to Have Their Day in Court: The Sanctioning of Contingency Fee Contracts, A History to 1940, 47 DePaul L. Rev. 231, 238 (1998)).

Nor has that rationale changed with time. The Second Circuit has explained that, "[m]any claimants . . . cannot afford to retain counsel at fixed hourly rates . . . yet they are willing to pay a portion of any recovery they may receive in return for successful representation. Ignoring reasonable contingent fee agreements or automatically reducing them would impair claimants' ability to secure representation." *Wells v. Sullivan*, 907 F.2d 367, 371 (2d Cir. 1990). While the various amici in this case debate whether contingency fees encourage or discourage insubstantial suits where the chance of recovery is slight, that ongoing argument is beyond the power of this court to resolve. The point remains that contingency fees are an acknowledged feature of our legal landscape, approved by legislative and judicial bodies alike, that help secure for the impecunious access both to counsel and to court. *See, e.g.*, 28 U.S.C. § 2678 (allowing contingency fees in suits against the United States under the Federal Tort Claims Act). "[A]ccepting reasonable contingency agreements . . . increases the likelihood that a claimant can find an attorney sufficiently committed and skilled to litigate successfully." *Wells*, 907 F.2d at 372.

The facts of this case illustrate precisely the type of situation in which a contingency fee may be the only way an individual can protect his interests. Yet the district court's analysis made no mention of the role that contingent compensation played in providing the Pellegrins with access to court. Mark Pellegrin's father and guardian, Jerry, faced a tough financial situation. His son was horribly injured, and he certainly did not have the estimated $17 million needed over a

lifetime of care. At the same time, neither did he have the resources to retain lawyers on an hourly basis to pursue a large insurance company in court, especially after National Union denied any coverage at all. The money to solve the problems was available in National Union's $21 million insurance policies, but it could only be obtained if someone else was willing to front the funds for attorneys and fees. The contingency agreement was, as the saying goes, the key to the courthouse door that allowed Jerry Pellegrin to retain the attorneys who eventually provided for his son's ongoing needs. The district court erred in failing to consider the access to the legal system that contingency fees like the ones herein provide.

2.

Nor did the district court consider the related point that contingency fee agreements transfer a significant portion of the risk of loss to the attorneys taking a case. Access to the courts would be difficult to achieve without compensating attorneys for that risk. The risks a lawyer assumes are not dissimilar to those undertaken, for example, by a realtor on commission, who accepts the possibility of no sale as well as the potential reward of a quick transaction. In addition, it may be necessary to provide a greater return than an hourly fee offers to induce lawyers to take on representation for which they might never be paid, and it makes sense to arrange these fees as a percentage of any recovery. "[M]any attorneys are unwilling to accept the risk of nonpayment without a guaranteed contingency percentage of the recovery." *Wells*, 907 F.2d at 371. In other words, plaintiffs may find it difficult to obtain representation if attorneys know their reward for accepting a contingency case is merely payment at the same rate they could obtain risk-free for hourly work, while their downside is no payment whatsoever.

Conversely, an attorney compensated on a contingency basis has a strong economic motivation to achieve results for

his client, precisely because of the risk accepted. As the Seventh Circuit has explained, "[t]he contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains." *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986). A contingency fee "automatically handles compensation for the uncertainty of litigation" because it "rewards exceptional success, and penalizes failure." *Id.* at 326. Because the district court's ruling failed to recognize that contingency fees provide attorneys due consideration for the risk they undertake, it reduced counsel's fee to a level that few attorneys would have accepted at the outset of litigation, when success was by no means assured and the size of any settlement or judgment was unpredictable.

Indeed, there were a number of sticky problems with the present suit when counsel undertook the representation, problems which Pellegrin's attorneys managed to overcome. The difficulties included National Union's reservation of rights letter to McKiernan based on his violation of KCI's alcohol policy and the prospect of securing a verdict against a judgment-proof defendant once coverage was denied. Additionally, North Carolina is a contributory negligence state where the failure to exercise due care by a plaintiff operates as a complete bar to recovery. *Cameron v. Canady*, 577 S.E.2d 700, 701 (N.C. App. 2003). Contributory negligence was an obvious defense in a case involving an intoxicated plaintiff who ran in front of a moving vehicle driven by a friend he knew had also been drinking. *See Taylor v. Coats*, 636 S.E.2d 581, 582-84 (N.C. App. 2006) (upholding summary judgment against plaintiff who was passenger with drunk driver). Finally, Pellegrin's attorneys faced the task of triggering coverage under a company insurance policy that only covered company-authorized travel without transforming the suit into an exclusive worker's compensation claim under the North Carolina co-employee immunity doctrine, which prevents employees injured during employment from suing co-workers. *See Ragland v. Harris*, 566 S.E.2d 827, 829-30

(N.C. App. 2002). The district court's failure to consider such risks and the fact that contingency fees "are set to account for the risk of nonrecovery" was error. *Hamner v. Rios*, 769 F.2d 1404, 1409 (9th Cir. 1985).

### B.

The district court also overlooked another important *Barber/Allen* factor—"the award involved and the results obtained." *Allen*, 606 F.2d at 436 n.1. We have noted that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Doe v. Chao*, 435 F.3d 492, 506 (4th Cir. 2006) (citation omitted). While that statement came in a fee-shifting case, there is no reason why it should be inapplicable in a contingency situation. After all, the job of an advocate is to achieve beneficial outcomes for a client, and success is every bit as important to the prevailing party in a contingency case as under a fee-shifting statute. It was error therefore for the district court to fail to recognize that an $18 million settlement served the client well by any standard and particularly in light of National Union's $21 million policy limit. While amicus argues that the district court did consider the settlement amount, the fact that it mentioned the $18 million sum briefly in its statement of the facts, *Pellegrin*, 598 F. Supp. 2d at 727, and again while analyzing a different *Barber/Allen* factor, *id.* at 730, does not constitute the full consideration of the significant results obtained by counsel that *Barber/Allen* requires.

Notably, Jerry Pellegrin, Mark Pellegrin's guardian, was satisfied with the results obtained by the lawyers he retained. He asked both the district court and this court in no uncertain terms to uphold the parties' contingency contract. Indeed, after the district court's order created a $5.4 million conflict between Jerry Pellegrin and his lawyers due to the fact that Mark Pellegrin would receive any funds not awarded as attorney's fees, Jerry Pellegrin retained his own counsel to request reversal of the district court's fee reduction and reinstatement

of the contingency agreement. To be sure, "a court must independently investigate and evaluate any compromise or settlement of a minor's claims to assure itself that the minor's interests are protected, even if the settlement has been recommended or negotiated by the minor's parent or guardian ad litem." *Salmeron*, 724 F.2d at 1363 (citation omitted). Nonetheless, we cannot ignore the fact that Jerry Pellegrin not only made no objection to the thirty-three percent contingency fee but also actively supported it, both as a point of personal honor and in recognition of the manner in which his son's lawyers provided for the lifetime needs of their severely disabled client.

Nor was the district court correct in discounting the obstacles Pellegrin's attorneys faced and ultimately overcame. Because the suit against McKiernan was undefended and because National Union settled quickly once it was sued, the district court concluded that "[t]he uncontested nature of this action strongly implies that Plaintiff's Counsel did not expend a great deal of time in the handling of this case and that a fee in the amount Plaintiff's Counsel seeks would be an unjustified windfall." *Pellegrin*, 598 F. Supp. 2d at 730.

That view, however, considers the litigation only from the point at which National Union awoke to the peril it faced due to a combination of its own decisions and trial strategy by Pellegrin's counsel. Pellegrin's lawyers should hardly be penalized for comprehending the strategic implications of National Union's decision to refuse to represent McKiernan, which due to the breadth of the duty to defend under North Carolina law conceivably left National Union on the hook for the full amount of the judgment obtained against McKiernan in National Union's absence. By the time mediation and settlement occurred, the case may well have appeared open and shut, but that was only because Pellegrin's attorneys had spent almost two years laying the groundwork to secure their client's interests. As noted above, the suit faced potential problems including the National Union reservation of rights letter,

the reality that McKiernan was judgment-proof, the fact that any contributory negligence on Pellegrin's part would operate as a bar to recovery in North Carolina, and the need to obtain payment from a company insurance plan that provided coverage only for company-authorized acts without triggering worker's compensation under North Carolina's co-employee immunity doctrine. Successful outcomes often make risks seem less risky in hindsight than they were at the time, and the court should not have ignored those risks merely because at some later point in litigation the defendant found it in its interest to settle.

## C.

Finally, the district court did not properly analyze the twelfth *Barber/Allen* factor, the customary fee for such work. *See Allen*, 606 F.2d at 436 n.1. Its analysis consisted of deciding with no real supporting evidence that $300 per hour was "a high hourly rate for a similarly-situated lawyer in North Carolina." *Pellegrin*, 598 F. Supp. 2d at 730. In doing so, the district court again overlooked the important fact that this case was a contingency fee case. The proper question involved, not some hourly rate in the abstract, but whether thirty-three percent was an acceptable fee for the contingency-based personal injury work performed by Pellegrin's counsel. In this regard, a number of respected North Carolina and Louisiana lawyers submitted affidavits stating that a thirty-three percent fee was actually lower than the forty percent they would have demanded to undertake Pellegrin's case. If the affidavits are to be disregarded in favor of contrary evidence, the trial court must explain why, without disregarding the contingent nature of the fee. *See id.* at 731 n.2 (mentioning affidavits but not their discussion of contingency fees). While court-appointed amicus attempts to discredit the submissions by claiming that they are "cookie-cutter affidavits" based on "conclusory statements," the affidavits properly recognized that the customary fee for such work is based on contingency

agreements. The district court should have based its analysis on a similar recognition.

### IV.

It should be apparent from our discussion of the above facts and circumstances that the district court's reduction of attorney's fees from thirty-three percent to a mere three percent was much too steep a decrease. Upon remand, the district court's discretion must be guided by a more rigorous analysis of the applicable *Barber/Allen* factors, and especially by a recognition of the important role played by contingency fees in this type of litigation. Because the district court failed to consider that significant factor as well the other considerations discussed above, the judgment must be vacated and remanded for further proceedings consistent with this opinion.

*VACATED AND REMANDED*