PRESENT: All the Justices

PORTSMOUTH 2175 ELMHURST, LLC,

                                          OPINION BY
v.  Record No. 181439                JUSTICE STEPHEN R. McCULLOUGH
                                     January 23, 2020
CITY OF PORTSMOUTH, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Kenneth R. Melvin, Judge

Portsmouth 2175 Elmhurst, LLC ("the Taxpayer") challenges its real estate tax assessments for the years 2013, 2014, and 2015, for a property located in the City of Portsmouth. It also contends that the attorney's fees charged to the Taxpayer to collect the assessments were not reasonable. For the reasons noted below, we will affirm the judgment of the trial court.

BACKGROUND

I.      THE PROPERTY.

2175 Elmhurst Lane consists of 12.544 acres and, at the time, a 141,229 square foot former meatpacking plant. The building was constructed in 1971. It originally served as a retail store; Smithfield Foods later repurposed the building to manufacture hot dogs. Smithfield Foods ceased operations at the plant in 2012. After determining that "the plant cannot support the changes in manufacturing technology and product development necessary to meet our needs," Smithfield Foods decided to sell it. The property was marketed for $1,900,000. The Taxpayer purchased it for $875,000 in 2013. The plant was vacant for the tax years at issue.

The City of Portsmouth assessed the property as follows:

2013, Land: $1,026,120, Building: $5,106,400, Total: $6,132,520.

2014, Land: $1,026,120, Building: $5,106,400, Total: $6,132,520.

In 2015, the City lowered the 2015 assessment as follows:

2015, Land: $1,026,120, Building: $2,742,040, Total: $3,768,160.

For these three years, the Taxpayer paid under protest a total of $233,540.31 in taxes, storm water fees and penalties, interest, and attorney's fees of $36,477.34.

After buying the property, the Taxpayer stripped and sold certain equipment and fixtures from the building:  the heating, air conditioning, sprinkler, canopies, bathroom facilities and cold storage.  The Taxpayer then set about selling the property.  It was marketed for $1,100,000 but sold for $575,000 in September of 2015.  The purchaser tore down the building on the property and built a distribution center.

The Taxpayer filed an amended complaint challenging the assessments for 2013, 2014, and 2015 as well as the imposition of attorney's fees.

II.     THE EXPERTS.

At the trial, the Taxpayer presented expert testimony from Lawrence J. Colorito, Jr., an experienced commercial real estate appraiser, who opined that, in light of the poor condition of the building and its unsuitability for alternative uses, the highest and best use for the property was to demolish the existing building and build a new building for industrial use.  Colorito considered all three approaches to valuation, the cost approach, the income approach, and the sales comparison method.  He testified that the cost approach was not feasible because the building had reached the end of its useful life.  Therefore, he relied on the sales comparison approach.  He examined a number of sales of properties he deemed comparable.  He concluded that the fair market value for the land was $1,442,580.  From this figure, Colorito deducted the cost of demolishing the building, which he estimated at $500,000.  In his opinion, the fair market

2

value of the property minus the cost of demolition yielded a fair market value of $950,000. Colorito's detailed appraisal was admitted into evidence.

The City offered the testimony of Holt William Butt, III, the assessor for the City of Portsmouth. Before working for the City, Butt spent several decades as a private real estate appraiser. Butt explained that the property was assessed under a mass appraisal system, which values a large group of properties as of a specific date.[1] Butt testified that the City appraises 3,000 commercial properties each year, and that in doing so, it uses a computer-assisted mass appraisal system, which relies on a cost model. This cost model incorporates information from a commercial service, Marshall & Swift, and cost information from local builders. The cost model is adjusted using market information and income information if it is available. In this instance, Butt testified that the City has never had income information about this property because the owners were also the operators and they did not pay themselves rent. The City reevaluates properties every year, and in so doing it employs statistical analysis to verify its assessments.

Butt testified that the City uses all three approaches, the cost, income, and sales comparison methods. He testified that he looked at the sale of the property but deemed the sale "non-qualified" because it was not "at market." Therefore, he did not consider the sale in assessing the property. *Id.* Counsel for the Taxpayer did not explore this point on cross-examination. Butt noted that during his time at the City Assessor's office, Smithfield Foods had never challenged the City's assessments.

---

[1] The 2012-13 version of the Uniform Standards of Professional Appraisal Practice ("USPAP") defines a mass appraisal as "the process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing." Appraisals Standards Board, USPAP at U-4 (2012-13 ed.). Unless otherwise indicated, citations to the USPAP appearing in this opinion are to the 2012-13 edition.

3

For the year 2015, after the Taxpayer appealed the tax assessments to the Board of Equalization, Butt "drilled down" to take a "closer look" and determined that the assessment overvalued the property. He determined that the deteriorating condition of the property justified additional functional depreciation and so he proposed a lower assessment in the amount of $3,811,480.

The trial court admitted a two-page document written by Butt in which he provided a description of the property and the building on it, and in which he explained the methodology used in the mass appraisal.

The City also offered the testimony from Evan Pierce, a real estate appraiser with over 40 years of experience. Pierce challenged on a number of grounds Colorito's conclusion that an industrial use constituted the highest and best use of the property. In his view, a commercial use would be better suited to the property. Pierce also took issue with the comparable sales of property the Taxpayers' experts relied on in their valuation. He did not offer a valuation of the property. He agreed that a commercial use would require the former meat packing plant to be torn down.

The Taxpayer also offered testimony from Nancy Gossett Dove, another experienced commercial real estate appraiser. She offered testimony supporting Colorito's conclusion that the property was best suited for an industrial use. She disputed Pierce's view that a commercial use was best, and defended the comparable sales Colorito employed in reaching his conclusions. With respect to Butt's assessment, Dove testified that "it does appear" that Butt employed only the cost approach. She explained that using the cost approach for older buildings makes little sense because it is so difficult to determine the amount of depreciation that applies. *Id.* Instead, she opined, the income and sales comparison methods are better for this type of property. She

4

also explained that she would have expected Butt to offer some comments on the highest and best use of the property. She further noted that although Butt acknowledged the fact that the property had been sold, it "appears that" he "ignored" those sales.

Dove authored a written review report critiquing the City's appraisal and citing a number of violations of the Uniform Standards of Professional Appraisal Practice ("USPAP")[2] as well as additional criticisms. The circuit court admitted this report into evidence.

III. THE ATTORNEY'S FEES.

The City of Portsmouth contracted with an attorney, Robert C. Barclay, IV, for representation in collecting delinquent taxes. His contract provided for a contingency fee of 20 percent of the taxes collected, including penalties and interest. He explained the process he employs in recovering delinquent taxes. First, the City will contact him about a property. At that point, his firm makes a copy of the City's file. He reviews the materials in the file and establishes an internal file. He identifies the owner of the property, which can sometimes be difficult. He then issues a demand letter. *Id*. In this instance, he discussed the case with counsel for the Taxpayer and with a potential buyer, who wanted a payoff letter. The Taxpayer suggested a payment plan, and counsel relayed that information to the City Treasurer. *Id*. Counsel also researched a number of issues to provide feedback to the City Treasurer about the likelihood of payment. He met with the City's Assessor and had several meetings with the Treasurer. He eventually drafted a promissory agreement between the Treasurer and the Taxpayer. Counsel drafted several additional payoff letters. Counsel acknowledged that he did not have to file suit. He explained that he did not keep hourly records for his work on the case.

---

[2] The Appraisal Standards Board of the Appraisal Foundation is authorized by the United States Congress as the source of appraisal standards and appraiser qualification. It publishes the Uniform Standards of Professional Appraisal Practice.

Barclay testified that the 20 percent contingency fee is standard for this type of work. The City

sought to recover $36,477.34 in attorney's fees, or 20 percent of the tax recovery.

IV.     THE TRIAL COURT'S JUDGMENT.

In a detailed memorandum opinion, the trial court upheld the assessments. The court

noted that when the Taxpayer purchased the property in 2013, it was a functional meatpacking

facility. Although Smithfield Foods found the plant unsuitable for its needs, the court concluded,

no evidence established that it was unsuitable for use by any other manufacturer. *Id.* The court

rejected the plaintiff's contention that the building had no value in 2013 and likely 2014. *Id.* For

the tax year 2015, however, the court concluded that the property had fallen into disrepair. The

court credited Butt's testimony that the property was assessed using proper techniques of mass

appraisal based on the cost approach. *Id.* The court wrote that the Taxpayer offered testimony

from experts whose opinions were in conflict with those of the City, but that the Taxpayer's

experts did not "at any point state that the City had violated any generally accepted practices,

standards, rules, or Virginia laws."

On the question of attorney's fees, the court, relying on the seven-factor test articulated in

our cases, concluded that a 20 percent fee was unreasonable. The court accordingly reduced the

attorney's fees from $36,477.34, sought by the City, to $24,000. This appeal followed.

ANALYSIS

I.     CODE § 58.1-3984(B) ESTABLISHES THE METHOD FOR CHALLENGING REAL
       PROPERTY ASSESSMENTS.

Code § 58.1-3984(B) establishes "a presumption that the valuation determined by the

assessor or as adjusted by the board of equalization is correct." The statute further provides that

> The burden of proof shall be on the taxpayer to rebut such
> presumption and show by a preponderance of the evidence that the
> property in question is valued at more than its fair market value or

6

that the assessment is not uniform in its application, and that it was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards as prescribed by nationally recognized professional appraisal organizations such as the International Association of Assessing Officers (IAAO) and applicable Virginia law relating to valuation of property. Mistakes of fact, including computation, that affect the assessment shall be deemed not to be in accordance with generally accepted appraisal practice.

*Id.*

As we held in *McKee Foods Corp. v. Cty. of Augusta*, 297 Va. 482, 499 (2019), the plain language of the statute establishes a presumption of correctness in favor of the locality, which the taxpayer must rebut by proving two things by a preponderance of the evidence:

(1) "that the property in question"

    (a) "is valued at more than its fair market value" or

    (b) "the assessment is not uniform in its application"

and

(2) the assessment "was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards . . . . and applicable Virginia law relating to valuation of property"

The Taxpayer, citing *West Creek Assocs., LLC v. County of Goochland*, 276 Va. 393, 417 (2008), contends that it can rebut the presumption of regularity by "proving a significant disparity between fair market value and assessed value." Our 2008 decision in *West Creek*, however, predates a significant revision of the statute. The General Assembly redrafted the statute in 2011, and in so doing made it clear that a taxpayer must shoulder the twofold burden of proof summarized above. *See* 2011 Acts ch. 232. "When a statute's language is plain and unambiguous, we are bound by the plain meaning of that language." *Mozley v. Prestwould Bd. of Dirs.*, 264 Va. 549, 554 (2002). "[W]hen the General Assembly has used words of a plain and

7

definite import, courts cannot assign to them a construction that would be tantamount to holding that the General Assembly intended something other than that which it actually expressed." *Id.* A significant disparity between fair market value and assessed value is certainly one way to prove the first element, that the property "is valued at more than its fair market value." Such a disparity, however, does not by itself suffice to establish the second element prescribed in the current statute, that the assessment "was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards" and "applicable Virginia law relating to valuation of property." Code § 58.1-3984(B).

II. THE TAXPAYER FAILED TO ESTABLISH THAT THE MASS APPRAISAL DID NOT CONFORM TO GENERALLY ACCEPTED APPRAISAL PRACTICES, PROCEDURES, RULES, AND STANDARDS OR APPLICABLE VIRGINIA LAW RELATING TO VALUATION OF PROPERTY.

The principles that guide our review of a judgment upholding a taxing authority's assessment of the fair market value of real estate are well established. The Constitution of Virginia requires that real estate be assessed at its fair market value. Va. Const. art. X § 2; *see also* Code § 58.1-3201 (requiring taxing authorities to assess real property at one-hundred percent fair market value).

As noted above, a locality benefits from a presumption of correctness, which the taxpayer must rebut by proving two things:

(1) "that the property in question"

 (a) "is valued at more than its fair market value" or

 (b) "the assessment is not uniform in its application

and

(2) the assessment "was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards . . . . and applicable Virginia law relating to valuation of property"

8

Code § 58.1-3984(B).

The 2013-14 assessment for the property was derived from a mass appraisal. Professional standards permit mass appraisals. *See* USPAP, Standards Rule 6.[3] An assessment derived from a mass appraisal benefits from a presumption of correctness. A taxpayer challenging an assessment based on a mass appraisal may rebut the presumption of correctness in two ways.

First, a taxpayer can rebut the presumption of correctness by proving, by a preponderance of the evidence, that the property is valued at more than fair market value (or that the assessment is not uniform in its application) and that the mass appraisal was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards" that govern mass appraisals. *See* Code § 58.1-3984(B).

Second, in the context of a mass appraisal, a taxpayer can rebut the presumption of correctness by proving, by a preponderance of the evidence, that the property is valued at more than fair market value and that the mass appraisal has indefensibly inflated the fair market value of the property.

This second method of rebutting the presumption of correctness arises from the nature of mass appraisals and the requirements of Virginia law. Mass appraisals are a "process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing." USPAP Definitions at U-4. Statistical models can be highly sophisticated and yield results that generally reflect the fair market value of a property. There

_____

[3] The 2018-19 version of the USPAP contains two standards for mass appraisals: standard 5 governing the development of the mass appraisal and standard 6 governing the reporting of a mass appraisal. See Appraisal Standards Board, USPAP at iii (2018-19 ed.) (explaining the changes made to the mass appraisal standard appearing in the 2012-13 edition).

will always be, however, deviations from the statistical norm. "It is implicit in mass appraisal that, *even when properly specified and calibrated* mass appraisal models are used, *some individual value conclusions* will not meet standards of reasonableness, consistency, and accuracy." USPAP at U-52 (emphasis added). In other words, a mass-appraisal value *presupposes* that it *may be* unreasonable, inconsistent, or inaccurate when applied to a specific property — which is a particularly important qualification for "ad valorem taxation." *See id.* at A-108 (USPAP Advisory Op. 32). A mass appraisal methodology may yield an anomalous result owing to the peculiar characteristics or uses of a property. A "special use" of a specific property, for example, may render the "mass appraisal model" inappropriate for ad valorem purposes "because the subject is an individual property, not a universe of properties," *id.* at A-111 (illustration 2), and "an individual property is being appraised rather than a universe of properties," *id.* (illustration 3).

Code § 58.1-3984(B) requires an assessment to be reached based on "applicable Virginia law relating to valuation of property." The Virginia Constitution mandates an assessment to "be at their fair market value, to be ascertained as prescribed by law," Va. Const. art. X, § 2. Even though a mass appraisal may be conducted according to professional standards, the taxpayer may rebut the presumption if the mass appraisal has indefensibly inflated the fair market value of the property. Such a grossly deviating assessment would not be in conformity with "applicable Virginia law." Code § 58.1-3984(B).

Minor differences of opinion concerning fair market value, however, will not suffice to rebut the presumption of correctness. We have explained that

> [t]he value of property is a matter of opinion and there must
> necessarily be left a wide room for the exercise of opinion,
> otherwise courts will be converted into assessing boards and in

10

assuming to act as such, would assume the powers lodged elsewhere by the law-making branch of government.

*City of Norfolk v. Snyder*, 161 Va. 288, 292 (1933).

We now turn to whether the Taxpayer rebutted the presumption of correctness using either of these two methods. "On appeal, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the prevailing party at trial." *Western Refining Yorktown, Inc. v. County of York*, 292 Va. 804, 815-16 (2016). "In a bench trial such as this, the trial court determines the credibility of the witnesses' conflicting testimony and the weight of the evidence." *Id.* at 816.

A. The Taxpayer presented a prima facie case that the property was valued in excess of fair market value.

The Taxpayer indisputably presented a prima facie case that "the property in question is valued at more than its fair market value." Code § 58.1-3984(B). The Taxpayer offered not only the testimony of a highly qualified expert to that effect, along with an exhaustive report, but the Taxpayer also offered evidence that the property had sold recently on two occasions – each time well below the City's assessed value. "It is well settled that a recent sale of the subject property, while not conclusive in determining fair market value, is entitled to 'substantial weight.'" *Keswick Club, L.P. v. County of Albemarle*, 273 Va. 128, 139-40 (2007) (citations omitted). In addition, the Taxpayer showed that the most recent purchaser demolished the building on the property. This provided compelling evidence that, as the Taxpayer claimed, the building had outlived its useful life and was, consequently, overvalued in the City's assessment.

B. The Taxpayer did not carry its burden of proving that the mass appraisal failed to conform to professional standards.

First, with respect to whether the mass appraisal conformed to professional standards, the Taxpayer was required to show that the assessment did not conform to:

11

generally accepted appraisal practices, procedures, rules, and standards as prescribed by nationally recognized professional appraisal organizations such as the International Association of Assessing Officers (IAAO) and applicable Virginia law relating to valuation of property.

As the trial court observed, none of the witnesses for the Taxpayer specifically testified under oath that the City's assessment "was not arrived at in accordance with generally accepted appraisal practices." Code § 58.1-3984(B). The Taxpayer responds that it did, in fact, allege a violation of a number of USPAP standards via a written report Dove authored. Dove's review report was admitted into evidence as a plaintiff's exhibit. Dove offered four criticisms of Butt's disclosure report, as well as some "additional concerns."

The four specific criticisms are as follows:

1.      Relying on the USPAP Scope of Work Rule, Dove wrote that this rule requires "each appraisal and appraisal review assignment" to satisfy three criteria:

> 1. identify the problem to be solved;
> 2. determine and perform the scope of work necessary to develop credible assignment results; and
> 3. disclose the scope of the work in the report.[4]

*See* USPAP at U-13. Dove concluded that while the "appraisal problem was somewhat identified and disclosed" in Butt's report, his report "incorrectly determined" the "scope of work necessary to provide credible assignment results."

2.      Butt did not disclose an opinion on the highest and best use of the property. Dove wrote:

> Failure to analyze the Highest and Best Use of the subject property "As If Vacant" and "As Improved" and failure to analyze the land value of the subject and its relationship with the value of the improvements could lead to less than credible or even misleading

---

[4] The record does not mention what edition of the USPAP Dove was employing. Because the tax years at issue are 2013-15, as indicated in note 1 *supra*, we cite to the 2012-13 edition of the USPAP publication. We have also consulted the 2014-15 edition, but there are no material differences between the two as pertains to this opinion.

12

assignment results. This is considered a potential violation of Standards Rule 1-3(b) as well as the Scope of Work Rule of USPAP.

3. Dove's report also states that Butt's failure to analyze the sales of the property "has resulted in misleading assignment results and is a potential violation of Standards Rules 1-1(a), (b), (h), and Standards Rule 1-5 as well as the Scope of Work Rule of USPAP." In the 2012-13 version of the USPAP, Standards Rule 1-1(a) states that, "in developing a real property appraisal, an appraiser must" "(a) be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to provide a credible appraisal." USPAP at U-16. Standards Rule 1-1(b) provides that in developing an appraisal, the appraiser should not "commit a substantial error of omission or commission that significantly affects an appraisal." *Id.* It is not clear what Dove refers to in referencing Standards "Rule 1-1(h)" because there is no such Standards Rule. USPAP contains a Standards Rule 1-2(h), which requires an appraiser to "determine the scope of work necessary to produce credible assignment results in accordance with the Scope of Work Rule." USPAP at U-18. Standards Rule 1-5 provides as follows:

> When the value opinion to be developed is market value, an appraiser must, if such information is available to the appraiser in the normal course of business:
>
> (a) analyze all agreements of sale, options, and listings of the subject property current as of the effective date of the appraisal; and
>
> (b) analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal.

USPAP at U-20. We also note that Standards Rule 6-5(a), not referenced in Dove's report, specifies that "[i]n developing a mass appraisal, when necessary for credible assignment results, an appraiser must . . . value the land by sales of comparable properties." *Id.* at U-50.

13

4.      Dove also faulted Butt for not researching and considering the sales of industrial properties, and opined that "the use of the Cost Approach only for a real appraisal of an industrial facility like the subject is insufficient to provide credible results." She wrote that "[t]he omission of the Sales Comparable Approach is not only a potential violation of the Scope of Work Rule but also a potential violation of Standards Rules 1-1(a), (b), and (h)."

Dove also wrote that Butt committed additional errors, by attributing value to the building. She observed that the building's demolition following its purchase constituted "market evidence" that the building had no value. In addition, in her opinion, Butt should have used much higher rates of depreciation than the rates he employed.

Dove concluded her report as follows:

> 1. The reviewed "appraisal" was not completed in accordance with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute nor was the report consistent with the Uniform Standards of Professional Appraisal Practice (USPAP) as adopted by the Appraisal Standards Board of the Appraisal Foundation.
>
> 2. The analyses in the reviewed "appraisal" was insufficient and incorrectly applied within the context of the requirements applicable to the work under review.
>
> 3. The opinions and conclusions in the reviewed "appraisal" are not considered credible within the context of the requirements applicable to the work under review.
>
> 4. The reviewed "appraisal" is considered misleading within the context of the requirements applicable to the work under review.

The Taxpayer is thus correct that a written report, admitted into evidence, specified alleged violations of USPAP standards. The trial court was also correct in noting that none of the live testimony explained how the mass appraisal "was not arrived at in accordance with generally accepted appraisal practices." Code § 58.1-3984(B). The question before us is

14

whether the Taxpayer's evidence established by a preponderance of the evidence that the City's assessment "was not arrived at in accordance with generally accepted appraisal practices." Code § 58.1-3984(B). Under the standard of review, we conclude that the Taxpayer's evidence does not compel this conclusion.

We begin at the granular level with Dove's written report. Dove's first criticism addressed the USPAP "scope of work" rule. USPAP defines the "scope of work" as "the type and extent of research and analyses in an assignment." USPAP at U-4. The scope of work rule "presents obligations related to problem identification, research and analyses." *Id*. at U-6. The document Butt prepared constitutes an after-the-fact explanation of what the City did in conducting a mass appraisal. When the Board of Equalization asked for a recommendation about the 2015 assessment, he concluded that the dilapidated condition of the building justified a lower assessment. The comments to USPAP's scope of work rule state that

> Scope of work includes, but is not limited to
>
> - the extent to which the property is identified;
> - the extent to which tangible property is inspected;
> - the type and extent of data researched; and
> - the type and extent of analyses applied to arrive at opinions or conclusions.

USPAP at U-13. The comments further state that "[a]ppraisers have broad flexibility and significant responsibility in determining the appropriate scope of work." *Id.*

The document Butt prepared, along with his testimony, certainly identified the property in significant detail and provided an explanation for the way the mass appraisal was conducted, and the document, in conjunction with his testimony, provided some measure of detail concerning "the type and extent of analyses applied to arrive at opinions or conclusions." It is not clear from this record what applicable standards and procedures require of an appraiser who

15

is an employee of the City, particularly when that employee is not preparing a conventional appraisal report but is instead developing a mass appraisal for tax purposes. It is also not clear on this record what the USPAP Scope of Work rule requires of such an official when that official is later asked to make an informal recommendation to the Board of Equalization. Dove's report does not delve into significant detail on these questions. The Taxpayer did not explore with Dove how the City's assessments violated USPAP or any other standards. The Taxpayer also did not challenge Butt on whether his tax assessments violated USPAP standards. On these facts, the circuit court did not err in concluding that the Taxpayer failed to show by a preponderance of the evidence that the City's mass appraisal or the subsequent 2015 revised assessment violated the USPAP scope of work rule.

Dove's second criticism addressed the highest and best use of the property. She wrote that the "[f]ailure to analyze the Highest and Best Use of the subject property 'As If Vacant' and 'As Improved' and failure to analyze the land value of the subject and its relationship with the value of the improvements could lead to less than credible or even misleading assignment results." She stated that "[t]his is considered a potential violation of Standards Rule 1-3(b) as well as the Scope of Work Rule of USPAP." *Id*. First, it is not clear whether a "potential violation" of professional standards rises to the level of an actual violation. Second, USPAP Standards Rule 6-3 provides that an appraiser must, in appraising real property, "identify and analyze the effect on use and value of the following factors," one of which is the "highest and best use of the real estate." USPAP at U-49. However, this rule further provides that this must be done "[w]hen necessary for credible assignment results." *Id*. There is no explanation in the record as to whether an opinion of the highest and best use of the real estate was "necessary for [a] credible assignment result[]" in this case.

16

On Dove's third point, Butt's failure to factor in previous sales, Butt testified without amplification that he did look at the sales, but that they were non-qualified and he, therefore, discounted them. This testimony was before the court. The Taxpayer did not explore this point with Butt on cross-examination, or offer any other evidence to refute the point. Although the Taxpayer states that these were arms-length transactions, and that may very well be the case, nothing in the record establishes any details concerning the transaction. Corporations occasionally prefer to dispose of assets quickly for a variety of reasons, such as tax treatment or cash flow, even if the asset has the potential to sell for a higher price. Without additional evidence to refute Butt's testimony, the court did not act arbitrarily in considering it.

Finally, Dove wrote that Butt potentially violated USPAP Standards Rules 1-1(a), (b), and (h) with his methodology, specifically in failing to research and consider sales of comparable properties. First, Standards Rule 1-1 does not specifically address mass appraisals. Second, Dove wrote about a "potential" violation of USPAP rules only. Third, the court had before it testimony from Pierce that the comparable sales employed by the Taxpayer were flawed. Fourth, on the assessment for the year 2015, it is not clear to what extent informal advice in the context of a Board of Equalization proceeding must satisfy detailed USPAP requirements.

In short, the trial court had before it a written report alleging a violation of professional standards found in USPAP. On a number of points, the report claimed "potential" violations of USPAP standards. The report cites but does not quote the USPAP Standards Rules. Without specific testimony explaining how the standards were, in fact, violated by the mass appraisal and the lowered 2015 assessment, and with some of the assertions in Dove's report contradicted by live testimony, we cannot conclude that the trial court erred in finding that the Taxpayer had not met its burden of proof.

The Taxpayer further contends that Butt should have reduced the value of the property for all three years and not just for 2015. Once Butt decided to "drill down" on the value of the property, in the context of a proceeding before the Board of Equalization, he did lower its assessed value significantly, but he did so on the rationale that the condition of the building property deteriorated under new ownership. The trial court could have found this explanation persuasive. Smithfield Foods had every incentive to maintain the building in good condition when it was in operation. The Taxpayer was chiefly interested in stripping away certain fixtures for resale and then selling the property. The trial court could have accepted as persuasive Butt's explanation for his change in valuation in 2015 but not for prior years.

These granular considerations aside, any taxpayer who challenges a tax assessment should be mindful that it is the taxpayer who bears the burden of the proving, among other things, that the assessment "was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards as prescribed by nationally recognized professional appraisal organizations such as the International Association of Assessing Officers (IAAO) and applicable Virginia law relating to valuation of property." Code § 58.1-3984(B). The Taxpayer notes that Dove's report was admitted and "she did not have to repeat it on the stand." Appellant Br. at 29. That may be correct in the abstract, but practices, procedures, rules, and standards in this technical area are generally beyond the expertise of judges. Submitting a written report, without additional clarifying testimony from the expert at the trial, may not be sufficient to persuade the factfinder that the assessment is deficient under the second part of the two-part test specified in Code § 58.1-3984(B). In other words, *asserting* in relatively conclusory fashion violations of the practices, procedures, rules and standards as prescribed by nationally recognized professional appraisal organizations is not the same thing as *proving* such violations.

18

This case thus presents a contrast with our decision in *McKee Foods*. In that case, the taxpayer presented detailed and unrefuted testimony from an expert explaining why the County's assessment, among other problems, did not comply with various USPAP standards, and in particular mass appraisal standards. 297 Va. at 489-93. In the case at bar, the Taxpayer's expert's written report faulted the assessment for failing to comply with professional standards, whereas the City's expert testified that his assessment did comply with mass appraisal standards. The trial court carefully weighed this contrasting testimony and found in favor of the City.

Applying the standard of review, as we must, the circuit court did not err in concluding that the Taxpayer failed to establish by a preponderance of the evidence that the City's assessment "was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards as prescribed by nationally recognized professional appraisal organizations such as the . . . IAAO and applicable Virginia law relating to valuation of property" as required by Code § 58.1-3984(B).

C. The Taxpayer did not carry its burden of proving that under applicable Virginia law the distinctive characteristics of the property rendered a falsified result under the mass appraisal that deviated significantly from fair market value.

With respect to the second method to challenge the mass appraisal, the Taxpayer attempted to show that the property possessed distinctive characteristics that rendered a falsified result under a mass appraisal methodology. The Taxpayer pointed out that the age of the building, the deferred maintenance, the many partitions inside the building, and the lowered ceiling height, yielded an artificially inflated result. The City responded by pointing out that the Taxpayer's appraiser had no firsthand knowledge of the condition of the property in 2013 or 2014 and the extent to which it had deteriorated in those years. The trial court found persuasive the fact that the facility was a functional meatpacking facility when Smithfield Foods shuttered

it, and the Taxpayer introduced no evidence "sufficient to warrant a conclusion that the former Smithfield plant was unsuitable for use by any other manufacturer." The trial court concluded that "the Property's long history as a manufacturing facility, coupled with its fixtures and site design, suggest that, at least in 2013, it had not outlived its useful life." As for tax year 2015, the Board of Equalization adjusted the assessment downward based on the condition of the building, which had deteriorated. The trial court was required to weigh conflicting testimony from experts concerning the fair market value of the property. Under the standard of review, we must conclude that the trial court did not err in holding that the Taxpayer did not met its burden of overcoming the presumption of correctness attached to the mass appraisal.

III. THE TRIAL COURT WAS WELL WITHIN ITS DISCRETION IN CONCLUDING THAT THE ATTORNEY'S FEES, WHICH WERE BASED ON A CONTINGENCY FEE, WERE REASONABLE.

"On appeal, we will set aside a trial court's determination of the amount of attorneys' fees to be awarded only if the court abused its discretion." *West Square, LLC v. Communication Technologies*, 274 Va. 425, 433 (2007). Code § 58.1-3958 permits a governing body to recover its attorney's fees from a delinquent taxpayer. The fees may not exceed "20 percent of the taxes or other charges so collected." *Id.*

The Taxpayer challenges the trial court's award, albeit reduced, of attorney's fees to the City. The Taxpayer argues that the City failed to prove the reasonableness of the fees under the multi-factor test we have articulated in a number of cases, including *Denton v. Browntown Valley Associates*, 294 Va. 76, 88 (2017). These factors, which do not constitute an exclusive list, include:

> (1) the time and effort expended by the attorney, (2) the nature of the services rendered, (3) the complexity of the services, (4) the value of the services to the client, (5) the results obtained, (6) whether the fees incurred were consistent with those generally

20

> charged for similar services, and (7) whether the services were necessary and appropriate.

*Id.* The Taxpayer argues that there was no evidence concerning factors (1), (2), (3), (4), (5), and (7). The Taxpayer further points out that the attorney acknowledged that he kept no records of his time spent on the case.

Under settled law, when a litigant seeks to pass along to an adversary the cost of attorney's fees, whether pursuant to a statute or a contract, a reviewing court must satisfy itself that the fees sought are reasonable. *Lambert v. Sea Oats Condominium Ass'n*, 293 Va. 245, 254 (2017) (statutory attorney's fee provision); *Chawla v. BurgerBusters, Inc.*, 255 Va. 616, 623 (1998) (contractual attorney's fee provision).

With respect to the Taxpayer's argument that the City did not satisfy the factors listed in our cases, we held in *West Square* that a fact-finder is not required to consider all of the factors we developed in every situation, and that "particular factors may have added or lessened significance depending on the circumstances of each case." 274 Va. at 434. This case involved a contingency fee. Judicial review of the reasonableness of attorney's fees should take into account the fact that the lawyer is operating under a contingency fee.

A contingency fee presents certain advantages over time-increment billing. A firm billing on an hourly basis might be tempted to artificially inflate the total amount of fees by overstaffing a case, charging an unjustifiably high hourly rate, or engaging in needless work. Those temptations are largely absent in a contingency arrangement. Additionally, "contingency fee agreements transfer a significant portion of the risk of loss to the attorneys taking a case." *In re Abrams*, 605 F.3d 238, 246 (4th Cir. 2010). Delinquent taxpayers may be bankrupt or nearly bankrupt. A lawyer might expend considerable effort in tracking down a delinquent taxpayer only to find that the funds are simply not there or that a corporation is defunct. There are no fee

21

petitions when a recovery under a contingency fee is nil.  Conversely, a lawyer may expend minimal time on a case and obtain a full recovery.

A contingency fee may be unreasonable.  For example, it may call for an excessively high percentage of the recovery, far beyond established norms.  In this case, however, we are nowhere close to an abuse of discretion.  The evidence established that a contingency fee is standard for the recovery of delinquent taxes.  For tax delinquency cases, Code § 58.1-3958 establishes a cap of 20 percent of the amount recovered.  The fee did not exceed the statutory cap of 20 percent – in fact, the court reduced the fee to well below the cap.[5]  A contingency fee at or below this legislatively sanctioned cap is presumptively reasonable.  Counsel explained to the court's satisfaction the work he performed in this case and the risk involved in this type of case. The fact that counsel did not meticulously document his expenditure of time to the same extent as under an hourly fee arrangement is hardly surprising under a contingency fee arrangement.[6] The trial court carefully considered the evidence and committed no abuse of discretion in imposing a fee award in the amount of $24,000.

---

[5] The City does not assign cross-error to the trial court's reduction of the fees.  We, therefore, have no occasion to address whether the fees should or should not have been reduced.

[6] A contingency fee, like any other fee a lawyer earns when representing a client, must be reasonable.  *See* Va. Sup. Ct. R., Part 6, § 2, Rule of Professional Conduct 1.5(a) ("[A] lawyer's fee shall be reasonable."); *id*. at Rule 1.5(c) (observing that "[a] fee may be contingent on the outcome of the matter for which the service is rendered," but that counsel must "provide the client with a written statement stating the outcome of the matter" that "show[s] the remittance to the client and the method of its determination," which is to be based on a written contingency fee agreement that states "the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal[;] litigation and other expenses to be deducted from the recovery[;] and whether such expenses are to be deducted before or after the contingent fee is calculated.").  Consequently, records establishing the time expended and costs incurred can be relevant show that the fee is reasonable. Such record keeping may also be relevant to establish the reasonable value of the attorney's services in a *quantum meruit* suit in the event the attorney is discharged prior to the conclusion of the case, or if the attorney becomes disabled during the pendency of the case.

## CONCLUSION

For the foregoing reasons, we will affirm the decision of the trial court.

*Affirmed.*